# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CamCara, Inc. d/b/a AST Waterjet, individually, and on behalf of all others similarly situated, | ) ) ) | Civil Action No. _____ |
| Plaintiff, | ) ) | |
| v. | ) ) | **CLASS ACTION COMPLAINT** |
| Air Products and Chemicals, Inc., | ) ) | JURY TRIAL DEMANDED |
| Defendant. | ) ) ) ) | **ECF CASE** |

1.      Defendant Air Products and Chemicals, Inc. ("Air Products") produces atmospheric gases such as oxygen, nitrogen, and argon, and process gases such as hydrogen, helium, and carbon dioxide.  It sells those gases worldwide, to thousands of customers in a variety of industries, including refining, chemical, manufacturing, and food and beverage.

2.      In the United States, Air Products generally sells its gases pursuant to standard-form Product Supply Agreements, Microbulk Product Supply Agreements, or similar standard-form documents, such as Air Products General Conditions of Sale (collectively, the "Product Supply Agreements" or "Agreements").

3.      The Product Supply Agreements typically contain multi-year terms.  The pricing terms for the gases are set forth in the body of the Agreements or in standard-form, gas-specific riders attached to the Agreements (the "Riders").  Generally, the price for each gas has two basic components:  "Price for Product" and "Other Charges."

4.      The Price for Product is typically a combination of the Unit Price for the gas, often expressed as $/1000 SCF (standard cubic foot) and a fixed Monthly Charge, typically expressed as $/month.

5.      The Other Charges are charges that Air Products imposes in addition to the Price

for Product.  These Other Charges include such things as "Hazmat Charges," "Delivery

Charges," and customer-specific fees and expenses unique to a particular purchaser.  One of the

Other Charges is identified as "Surcharges."  This litigation concerns Surcharges.

6.      The Product Supply Agreements define Surcharges as follows:

> Surcharges may be assessed in order for [Air Products] to recover increases in its production or delivery costs (e.g., increases in the cost of diesel fuel, natural gas and/or electric power, or increases arising out of utility deregulation or change in laws.)

Similarly, the Air Products General Conditions of Sale define Surcharges as follows:

> [Air Products], in its sole discretion, shall charge and Buyer hereby agrees to pay to [Air Products], surcharges for increases in [Air Product]'s production and delivery costs caused by changes in law or increases in fuel, energy, or feedstock costs (including but not limited to diesel fuel, natural gas and/or electric power affecting [Air Product]'s producing facility(ies) ("Surcharges").  These Surcharges shall be in addition to the Unit Price and Monthly Charge.

7.      The purpose of Surcharges, if assessed, is to allow Air Products to pass through

specified increases in its production and delivery costs, where those increases occur after the date

on which the parties entered into a particular Product Supply Agreement and where those

increases directly impacted the Agreement under which the Surcharge was assessed.  For

example, if Air Products entered into a Product Supply Agreement with a customer and

thereafter experienced an increase in its diesel fuel, natural gas, or electric power costs which

increased its cost of performance under that Agreement, Air Products could assess a Surcharge

"to recover [those] increases."  In practice, however, Air Products assessed Surcharges on

plaintiff and the other class members without regard to "increases in its production and delivery

costs."

8.      Moreover, Surcharges were not assessed with reference to any particular Product

Supply Agreement, but often on an across-the-board basis without regard to when the Agreement

may have been entered into, and without regard to whether its production and delivery costs

related to a particular Agreement had increased.  Rather, Air Products arbitrarily assessed

Surcharges on a routine basis simply to generate additional revenue.

9.      In addition, Air Products would often discriminatorily assess Surcharges on

similarly-situated customers, based solely on what it thought it could obtain from different

customers.

10.      The Product Supply Agreements uniformly provide that they "shall be governed

by the laws of the Commonwealth of Pennsylvania."  The Air Products General Conditions of

Sale provide that they "shall be construed and governed by the law of the Commonwealth of

Pennsylvania" and that "[t]he terms of the Uniform Commercial Code . . . shall apply."

11.      Pennsylvania has adopted the Uniform Commercial Code.  13 Pa. Cons. Stat.

§§ 1101 *et seq.*  The Product Supply Agreements are agreements for the sale of goods and are

governed by Article 2 of Pennsylvania's Uniform Commercial Code.  13 Pa. Cons. Stat.

§§ 2101-2725.

12.      Because Air Products may assess Surcharges at a time and in an amount that is

unilaterally fixed by Air Products, Surcharges are considered to be open price terms under

§ 2305(b).

13.      With respect to open price terms, § 2305(b) provides:  "A price to be fixed by the

seller or by the buyer means a price for him to fix in good faith."  "Good faith" is defined as

"honesty in fact and the observance of reasonable commercial standards of fair dealing."  13 Pa.

Cons. Stat. § 1201(b)(20).  Air Products was required, when it assessed Surcharges, to act in

good faith.  As such, it was required to act honestly and to observe reasonable commercial standards of fair dealing.

14.    Because Air Products assessed Surcharges arbitrarily, discriminatorily, and without regard to increases in its production or delivery costs, Air Products breached the Product Supply Agreements and its good-faith obligations to plaintiff and each of the class members.

15.    Plaintiff and the other members of the class are entitled to return of all Surcharges that Air Products wrongfully assessed, and interest on each such Surcharge at the statutory rate.

**Parties**

16.    Plaintiff CamCara, Inc. d/b/a AST Waterjet ("AST"), is a Texas corporation, organized under the laws of the State of Texas, with a place of business in Grand Prairie, Texas. AST was a customer of Air Products from approximately March 2015 to March 2020, pursuant to a Microbulk Product Supply Agreement, dated March 10, 2015.  AST paid Surcharges to Air Products during this timeframe.

17.    Defendant Air Products is a producer and seller of atmospheric and process gases. It is incorporated in Delaware, and maintains its principal place of business in Allentown, Pennsylvania.

**Jurisdiction and Venue**

18.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2)(A), because some members of the class are citizens of a state different from defendant Air Products, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are over 100 members in the proposed class.

19.    The Court has personal jurisdiction over all parties to this lawsuit, and venue is proper under 28 U.S.C. § 1391(b)(2), because defendant is incorporated in this district.

**Factual Allegations**

**Plaintiff AST**

20.       AST is a manufacturing company which provides sheet metal fabrication

solutions, including laser cutting, waterjet cutting, computer numerical control (CNC) routing

and machining, and press brake services.

21.       On March 10, 2015, AST entered into a standard-form (Form 3076) Microbulk

Product Supply Agreement with Air Products for the purchase of liquid nitrogen (the "AST

Agreement").  (Attached as Exhibit 1.)

22.       The AST Agreement was amended on April 13, 2015 to establish the Unit Price

for the liquid nitrogen at $9.50/1000 SCF.  On March 1, 2017, the Unit Price increased to

$10.45/1000 SCF.  The contract was terminated in early 2020.

23.       The AST Agreement also contained separate pricing for a "Delivery Charge" and

a "Hazmat Charge."  Those charges were initially $40 and $20 respectively per delivery and

were raised to $50 and $30 in October 2018.

24.       Page 2 of the AST Agreement also contained the following provision:

> Surcharges.  Surcharges may be assessed in order for [Air Products] to recover
> increases in its production or delivery costs (e.g., increases in the cost of diesel
> fuel, natural gas and/or electric power, or increases arising out of utility
> deregulation or change in laws).

25.       From March 2015 to April 2018, Air Products did not assess any Surcharges

pursuant to this provision.

26.       Beginning in May 2018 and continuing through March 2020, Air Products

imposed Surcharges on every one of AST's invoices.  Moreover, the amount of the Surcharges

steadily increased from 1% of the Unit Price in May 2018 to over 35% of the Unit Price by

November of 2019, where it remained for the balance of the AST Agreement.

27.    AST received no notice or explanation for the Surcharges.  The amounts simply appeared on the invoices Air Products sent to AST.

28.    Air Products' "diesel fuel, natural gas and/or electric power" costs related to performing its obligations under the AST Agreement did not increase 35% between May 2018 and November 2019.  Indeed, as the following graph shows, the average price for industrial natural gas, industrial electricity, and highway diesel decreased during this period.



29.    Air Products assessed the Surcharges on AST and raised the amount of the Surcharges – ultimately to over 35% of the Unit Price – without regard to any "increases in its production or delivery costs."  Rather, Air Products imposed the Surcharges on AST arbitrarily, discriminately, and solely as a way to increase the Unit Price and enhance revenue.

30.     Air Products was able to assess these Surcharges because of the small number of competing merchant gas suppliers and the substantial expense, disruption, and inconvenience experienced by customers switching from one supplier to another.

**Defendant Air Products**

31.     Air Products' program of assessing and continuously increasing Surcharges was part of a corporate strategy of relentlessly focusing on the company's bottom line without regard for its customers or the Surcharges language in the Product Supply Agreements.

32.     This can be seen in Air Products' reported financial results.  From 2014 to 2019 (the last full year of publicly reported results), Air Products' revenues declined from $10.4 billion to $8.9 billion, a decline of over 10%.  Yet, from 2014 to 2019, every measure of Air Products' profitability increased:

- Net income increased from under $1 billion to over $1.8 billion.

- Earnings per share increased from $3.24 to $7.94.

- Adjusted EBITDA margin increased from 25.1% to 41.9%, an increase of almost 1700 basis points.

- From 2014 to 2019 Air Products compound annual growth rate was 13%.

33.     The only way a company can sell less and make more is by increasing the margin on existing (declining) sales.  This margin enhancement was due, in significant part, to Air Products' Surcharges strategy:  assess and collect Surcharges wherever possible without regard to whether those Surcharges were permitted under the Product Supply Agreements or whether there had been any increases in Air Products' "production or delivery costs."

34.     In the 2019 Annual Report to shareholders, Air Products' Chairman and CEO, Seifi Ghasemi, commented on how Air Products had managed to achieve growing profitability

with declining sales.  He noted that Air Products was in the fifth year of its "Five-Point Plan to

substantially reposition Air Products and make it the best performing industrial gas company in

the world."  One of these five points reads as follows:

> Change the incentive compensation system to ensure that it is directly related to performance by each unit around the globe, with a focus on cash generation and profitability.  (Emphasis added.)

35.      One of the changes to the incentive compensation system was to pay employees

bonuses on assessing and collecting Surcharges.  Air Products had a contractual right to assess

Surcharges if specified conditions were met – i.e., there were "increases in its production or

delivery costs."  It did not need to provide bonuses to its employees to assess Surcharges.  It did

so, however, to incentivize employees to assess extra-contractual Surcharges on customers to

increase "cash generation and profitability."

36.      Air Products has concealed its conduct relating to Surcharges, both from its

customers and the public at large.  If customers like plaintiff AST asked questions or complained

about Surcharges, Air Products' sales and customer service personnel were instructed to ignore,

deflect, or threaten termination of product deliveries.

37.      In its public filings, Air Products informs investors that it "mitigate[s] electricity,

natural gas, and hydrocarbon price fluctuations contractually through pricing formulas,

surcharges, and cost pass-through and tolling arrangements."  Air Products & Chemicals, Inc.,

2019 Form 10-K Annual Report 5.  Similarly, Air Products represents that it "typically

contract[s] to pass-through cost increases in energy and raw materials to customers . . . ."  *Id.* at

11.

38.      Although it is true that Air Products did, in fact, contract with customers "to pass-

through cost increases in energy and raw materials," it did not honor those contracts and imposed

8

Surcharges to raise revenue and increase margin, irrespective of any "cost increases in energy

and raw materials."

## Class Action Allegations

39.     Plaintiff brings this class action under Rule 23(b)(3) of the Federal Rules of Civil

Procedure.

40.     Plaintiff seeks certification of the following class:

All individuals and entities who, within the four-year period prior to filing this complaint, paid Surcharges to Air Products pursuant to a Product Supply Agreement, Microbulk Product Supply Agreement, Air Products General Conditions of Sale, or other materially similar agreement, containing a Surcharges provision, which provided in substance that "Surcharges may be assessed in order for [Air Products] to recover increases in its production or delivery costs (e.g., increases in the cost of diesel fuel, natural gas and/or electric power, or increases arising out of utility regulation or change in laws.)."

41.     Excluded from the class are:  (i) any person or entity who has previously obtained

a judgment or settled a claim against Air Products relating to the claims asserted in this

complaint or who has previously executed a release for such claims; or (ii) any person or entity

that is a party to an arbitration agreement with Air Products that would apply to the transactions

which form the basis of the claims asserted in this complaint.

42.     The class is so numerous that joinder of all members is impractical.  Although the

exact number and identity of class members is unknown to the plaintiff at this time and can only

be ascertained through discovery, plaintiff believes that the number of class members is in excess

of 5,000.  The precise number and identification of the class members will be easily

ascertainable from Air Products' records.

43.     There are questions of law and fact common to all members of the class.  Those

common questions include, but are not limited to:

(i)    Did Air Products breach its Product Supply Agreements with class

members by arbitrarily and discriminatorily assessing Surcharges without

regard to any "increases in its production and delivery costs"?

(ii)    Did Air Products breach its duty under 13 Pa. Cons. Stat. § 2305(b) to act

in good faith when fixing the amount of any Surcharges it assessed upon

class members?

(iii)    Are the class members entitled to the return of all improperly-assessed

Surcharges and interest thereon of the statutory rate?

44.    Plaintiff's claims are typical of the claims of the class because it, like the class

members, paid the Surcharges improperly assessed by Air Products.

45.    Plaintiff will fairly and adequately protect the interests of the class because it has

paid Surcharges during the class period, its interests do not conflict with the interests of the class,

and it has retained counsel experienced in litigating class actions and matters involving similar

questions of law.

46.    The questions of law or fact common to the members of the class predominate

over any questions affecting only individual members, and a class action is superior to other

available methods for fairly and efficiently adjudicating the class members' claims.

47.    Joinder of all class members is impracticable.

48.    Furthermore, because the injury suffered by many of the class members may be

relatively small, the expense and burden of individual litigation make it impossible for those

members of the class to individually redress the wrongs done to them.  There will be no

difficulty in the management of this action as a class action.

**Cause of Action**

49.     Plaintiff and each member of the class entered into Product Supply Agreements.

50.     Under the terms of these Agreements, Air Products was permitted to assess Surcharges only "in order for [it] to recover increases in its production or delivery costs (e.g., increases in the cost of diesel fuel, natural gas and/or electric power, or increases arising out of utility deregulation or change in laws.).".

51.     Air Products arbitrarily and discriminatorily assessed Surcharges on members of the class without regard to "increases in its production and delivery costs."

52.     The Surcharges provision in the Product Supply Agreements is an open-price term as defined in 13 Pa. Cons. Stat. § 2305(b).  This statute applies to the claims of all class members because the Product Supply Agreements uniformly provide that they shall "be governed by the laws of the Commonwealth of Pennsylvania."

53.     Pursuant to 13 Pa. Cons. Stat. § 2305(b), Air Products was required to act in good faith when assessing and collecting Surcharges.  Good faith is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing."  13 Pa. Cons. Stat. § 1201(b)(20).  The drafters of the Uniform Commercial Code intended that the Code's open-price term provisions would prevent arbitrary and discriminatory pricing.

54.     Air Products breached the Agreements by assessing and collecting Surcharges arbitrarily and discriminatorily and without regard to its "increases in its production and delivery costs."  Air Products also breached its duty of good faith imposed by § 2305(b) by not acting honestly and not observing reasonable commercial standards of fair dealing.

11

55.     Members of the class have been damaged by Air Products' breaches and are entitled to a return of all improperly-assessed Surcharges and interest thereon at the statutory rate.

56.     Though not required to do so, prior to bringing suit, plaintiff, pursuit to 13 Pa. Cons. Stat. § 2607(c)(1), on behalf of itself and the class, notified Air Products of its breaches of the Product Supply Agreements and its duty of good faith.

### Prayer for Relief

Plaintiff, on behalf of itself and members of the class, requests that this Court grant the following relief:

1.  An order certifying this action as a class action under Fed. R. Civ. P. 23(b)(3).

2.  A judgment declaring that Air Products has breached the Product Supply Agreements and its duty of good faith imposed by 13 Pa. Cons. Stat. § 2305(b).

3.  An award of money damages or restitution to compensate members of the class for Air Products' breaches.

4.  An award of prejudgment interest.

5.  An award of attorneys' fees, costs and expenses.

6.  A judgment enjoining Air Products from continuing its breaches of the Product Supply Agreements and its duty of good faith imposed by 13 Pa. Cons. Stat. § 2305(b).

7.  Such other relief as the Court deems equitable and just.

**Demand For Jury Trial**

Plaintiff requests that this matter be tried before a jury.


September 22, 2020                              Respectfully Submitted,

                                        **BERNSTEIN LITOWITZ BERGER**
                                          **& GROSSMANN LLP**

                                        By  */s/ Gregory V. Varallo*
                                            Gregory V. Varallo (Del. Bar #2242)
                                            500 Delaware Avenue, Suite 901
                                            Wilmington, DE  19801
                                            Telephone: (302) 364-3601
                                            Fax: (302) 364-3610
                                            Greg.Varallo@blbglaw.com

                                            William H. Narwold (CT 00133)
                                            Mathew P. Jasinski (CT 27520)
                                            **MOTLEY RICE LLC**
                                            One Corporate Center
                                            20 Church Street, 17th Floor
                                            Hartford, CT  06103
                                            Telephone: (860) 882-1676
                                            Fax: (860) 882-1682
                                            bnarwold@motleyrice.com
                                            mjasinski@motleyrice.com

                                            *Counsel for Plaintiff*