IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CAMCARA, INC. d/b/a AST WATERJET, individually, and on behalf of all others similarly situated, | : : : : | |
| Plaintiff, | : | CIVIL ACTION NO. 21-2264 |
| | : | |
| v. | : | |
| | : | |
| AIR PRODUCTS AND CHEMICALS, INC., | : : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

Smith, J.                                                                 March 23, 2023

Under the Pennsylvania Commercial Code, contracts setting an open-price term contain an implied covenant to set the price term in good faith. If sufficient evidence is shown at the summary judgment stage upon which reasonable jurors could disagree, a jury must determine whether the duty of good faith was violated.

Here, the dispute centers on a five-year supply agreement in which the defendant agreed to supply liquid nitrogen to the plaintiff. There were two open-price terms in this agreement, one related to the assessment of surcharges and the other to the payment of installation and removal costs. The defendant has moved for summary judgment on the plaintiff's claims relating to these price terms and on its counterclaims, where it seeks payment for certain outstanding invoices. The parties agree that the defendant's counterclaims, which are pleaded in the alternative, are inextricably intertwined with the plaintiff's claim concerning the payment and removal costs.

Based on the existing record, there are genuine disputes of material fact to the question of the defendant's good faith in assessing surcharges, which preclude this court from entering

summary judgment in favor of the defendant and requires a jury to decide. However, regarding the payment of installation and removal costs, there is no such dispute and the defendant is entitled to judgment as a matter of law. Accordingly, for the reasons discussed below, the court will grant in part the motion for summary judgment as to the plaintiff's claim concerning payment of installation and removal costs and the defendant's contract-related counterclaim. The court will deny the motion as to the surcharges.

## I.     PROCEDURAL HISTORY

The plaintiff, Camcara, Inc., doing business as AST Waterjet ("AST"), individually and on behalf of a putative class, commenced this action by filing a complaint against the defendant, Air Products and Chemicals Inc. ("Air Products"), in the United States District Court for the District of Delaware on September 22, 2020. *See* Doc. No. 1. In the complaint, AST alleged that it had entered into a product supply agreement with Air Products in March 2015 by which Air Products would supply it with liquid nitrogen for a five-year period. *See* Compl. at ¶¶ 16, 21, Doc. No. 1. AST asserted that Air Products breached the agreement and its duty of good faith and fair dealing when it assessed and collected surcharges even though they did not relate to any increases in production or delivery costs. *See id.* at ¶¶ 49–56.

On October 27, 2020, Air Products filed a motion to dismiss and supporting memorandum of law. *See* Doc. Nos. 8, 9. AST filed a response in opposition to the motion to dismiss on November 25, 2020. *See* Doc. No. 15. Air Products filed a reply brief in further support of its motion to dismiss on December 11, 2020. *See* Doc. No. 18.

On February 24, 2021, the District of Delaware entered an order requiring the parties to show cause why the court should not transfer the case to the Eastern District of Pennsylvania. *See* Doc. No. 19. The parties filed conflicting responses to the order: Air Products agreed that the case

should be transferred; AST argued that the case should remain in the District of Delaware. *See* Doc. Nos. 20, 21. On May 4, 2021, the District of Delaware transferred the case to this court pursuant to 28 U.S.C. § 1404(a). *See* Doc. No. 22.

This court held an initial pretrial conference in conjunction with oral argument on the motion to dismiss on June 21, 2021. On September 20, 2021, the court denied the motion to dismiss. *See* Doc. No. 34. Air Products filed an answer with affirmative defenses to the complaint, as well as two counterclaims for breach of contract and unjust enrichment, on October 4, 2021. *See* Doc. No. 35. AST filed an answer with affirmative defenses to Air Products' counterclaims on October 6, 2021. *See* Doc. No. 36. On that same date, the court held a telephone conference with counsel to discuss the schedule moving forward in this matter. The following day, the court entered an order (1) directing the parties to conduct focused discovery on the substantive issues on the lead plaintiff's claim and (2) indicating that the court would permit class discovery if the claim survived a motion for summary judgment. *See* Doc. No. 38.

On January 24, 2022, AST filed a motion to amend/correct the complaint and supporting documents. *See* Doc. Nos. 53, 55. The court granted this motion as unopposed on January 27, 2022.[1] *See* Doc. No. 57. AST filed an amended complaint on February 14, 2022. *See* Doc. No. 59.[2] In the amended complaint, AST brought two counts for breach of contract. *See id.* at 14–16. Count I alleges that Air Products "arbitrarily and discriminatorily assessed [s]urcharges on [AST]" in violation of the agreement and its duty of good faith. *See id.* at 14–15. Count II alleges that Air Products breached the agreement by including shipping costs before installation and after removal

---

[1] The court had scheduled a telephone conference for January 25, 2022, to discuss the schedule moving forward. *See* Doc. No. 51. During this conference, defense counsel indicated that Air Products did not oppose the motion to amend the complaint.

[2] Doc. No. 59 is the redacted version of the amended complaint. The unredacted version is filed under seal and docketed at Doc. No. 61.

of the storage equipment containing liquid nitrogen and by amortizing the storage equipment beyond the definite term of the agreement. *See id.* at 15–16.

On February 24, 2022, Air Products filed an answer with affirmative defenses to the amended complaint, as well as two counterclaims for breach of contract and unjust enrichment relating to AST allegedly failing to pay costs associated with the removal of the liquid nitrogen storage equipment from AST's property following termination of the agreement. *See* Doc. No. 63. On March 28, 2022, AST filed an answer with affirmative defenses to the counterclaims. *See* Doc. No. 80.

Following the close of discovery, Air Products filed the instant motion for summary judgment, a statement of undisputed material facts, and a memorandum in support thereof on May 25, 2022. *See* Doc. No. 85.[3] On June 24, 2022, AST filed a response in opposition to the motion for summary judgment, a response to Air Products' statement of undisputed material facts along with AST's statement of additional facts which it believed precluded summary judgment, and a declaration with numerous attached exhibits. *See* Doc. Nos. 89, 90.[4] Air Products filed a reply brief in support of its motion for summary judgment on July 1, 2022. *See* Doc. No. 96.[5] On July 12, 2022, the court held oral argument on the motion for summary judgment. The motion is ripe for disposition.

---

[3] Unredacted copies of Air Products' statement of undisputed material facts, supporting memorandum, and certain exhibits are docketed under seal at Doc. No. 87. The court cites to the unredacted copies of these documents in this memorandum opinion.

[4] Unredacted copies of AST's response to the motion, AST's response to Air Products' statement of undisputed material facts, and AST's additional undisputed material facts precluding summary judgment, and certain exhibits attached to AST's supporting declaration are docketed under seal at Doc. Nos. 92, 93. The court cites to the unredacted copies of these documents in this memorandum opinion.

[5] An unredacted copy of this reply brief is docketed at Doc. No. 97.

## II.     FACTUAL BACKGROUND

Air Products produces and sells atmospheric gases, including liquid nitrogen. *See* Air Products and Chemicals Inc.'s Statement of Undisputed Material Facts in Supp. of its Mot. for Summ. J. ("Def.'s SOF") at ¶ 1, Doc. No. 87; Pl.'s Resps. to Def.'s Statement of Undisputed Material Facts ("Pl.'s Resp.") at ¶ 1, Doc. No 92-1.[6] AST manufactures metal-fabricated components. *See* Def.'s SOF at ¶ 2; Pl.'s Resp. at ¶ 2. AST acquired a metal-cutting laser that required liquid nitrogen to operate. *See* Def.'s SOF at ¶¶ 3–4; Pl.'s Resp. at ¶¶ 3–4. On March 10, 2015, AST entered into a Microbulk[7] Product Supply Agreement (the "Agreement") with Air Products for liquid nitrogen. *See* Def.'s SOF at ¶¶ 5, 7; Pl.'s Resp. at ¶¶ 5, 7.

### A.     <u>The Agreement's Terms</u>

Under the Agreement, AST would purchase all liquid nitrogen from Air Products for five years[8] for the agreed-upon unit price. *See* Compl., Ex. 1, Product Supply Agreement ("PSA") at ECF p. 2, Doc. No. 1-1;[9] *see also* Pl.'s SOF at ¶ 8. The Agreement permitted Air Products to increase the unit price upon written notice at least 15 days before the proposed increase would take effect. *See* PSA at ECF p. 2. After receiving this notice, AST could prevent a price increase via a

---

[6] AST's response to Air Products' statement of undisputed material facts as well as its statement of additional facts are contained in the same document. *See* Doc. No. 92-1. AST's response starts on page 2 of Doc. No. 92-1, and its statement of additional facts starts on page 37. The court will separately cite to these portions in this memorandum opinion.

[7] "Microbulk" refers to "[s]mall tanks at a customer site that . . . [Air Products] refill with truck deliveries." Pl.'s Statement of Add'l Facts that Preclude Summ. J. ("Pl.'s SOF") at ¶ 1, Doc. No. 89-1 (second alteration in original).

[8] After the initial five years, the Agreement would renew year-to-year unless it was terminated by providing at least twelve months' prior notice. Pl.'s SOF at ¶ 5. In this regard, the Agreement provided:

> The initial Term of this Agreement shall be 60 months . . . and the Term shall continue after the initial Term from year to year unless and until terminated by either party as of the end of the initial Term, or as of the end of any such subsequent 12-month period, by not less than twelve (12) months' prior written notice of termination.

PSA at ECF p. 2.

[9] A clearer version of the Agreement is attached as Exhibit B to the Declaration of Heidi G. Crikelair in Support of Air Products' Motion for Summary Judgment, which is currently under seal. *See* Doc. No. 85-4.

"shop clause" in the Agreement, which required it to show, in writing, "evidence of a lower total price for like quantity, quality and delivery method from a responsible supplier[.]" *Id.*; Pl.'s SOF at ¶ 9. If the competitor's offer met these terms, Air Products would have "the option to meet the lower price offered or reinstate its previous pricing in effect at time of notification." PSA at ECF p. 2.

One month after entering into the Agreement, the parties amended it. Pl.'s SOF at ¶ 10. The amendments included (1) a requirement that Air Products remove a 450-liter storage tank and replace it with a larger 3,000-liter storage tank on AST's property, (2) an increase in the monthly service charge ("MSC")[10] from $200 per month to $500 per month, and (3) a decrease in the unit price from $22 per 1,000 SCF[11] to $9.50 per 1,000 SCF. *See id.* at ¶¶ 2, 3, 8, 10.

## B.     Start of the Agreement

The relationship did not start well. *See id.* at ¶ 11. AST was dissatisfied with Air Products' service during the first year and informed Air Products that—despite four years remaining on the Agreement—AST intended to seek a new supplier of liquid nitrogen. *See id.* After receiving notice of AST's dissatisfaction, the parties exchanged emails which ultimately resulted in AST deciding to finish out the Agreement. *See id.* at ¶¶ 12–13. In addition, to avoid automatic renewal, AST notified Air Products on April 5, 2016, that it would terminate the Agreement at the conclusion of the five-year term in March 2020. *See id.* at ¶ 14.

On March 1, 2017, Air Products provided AST with notice of its intent to raise the unit price for the nitrogen from $9.50 to $10.45 per 1,000 SCF. *See id.* at ¶ 26. In response to this

---

[10] Air Products describes the monthly service charge ("MSC") as a "monthly rental fee" for the liquid nitrogen storage tank. *See* Pl.'s SOF at ¶ 2.

[11] "SCF" is an abbreviation for standard cubic feet. Pl.'s SOF at ¶ 4. In many of the documents, SCF is used interchangeably with "FTS," which "specifically means 1 cubic foot at a temperature of 70ºF and pressure of 1 [standard atmosphere ("atm")]." *Id.* For the purpose of this memorandum opinion, the court uses SCF for consistency.

notice, AST attempted to exercise the shop clause; however, because the quote did not match the terms of the Agreement, the attempt failed and the increased price went into effect. *See id.* at ¶¶ 27–28. Then, on September 15, 2017, Air Products again provided AST with notice of its intent to increase the unit price of the liquid nitrogen to $11.50 per 1,000 SCF. *See id.* at ¶ 29. This time, AST successfully exercised the shop clause and Air Products rescinded the price increase. *See id.* at ¶¶ 30–31.

### C.   Surcharges

On May 4, 2018—almost three years into the agreement—Air Products assessed a surcharge of $0.10 per 1,000 SCF of liquid nitrogen against AST's account. Def.'s SOF at ¶ 54; Pl.'s Resp. at ¶ 54; Pl.'s SOF at ¶ 33. With respect to these surcharges, the Agreement permitted Air Products to assess surcharges in certain circumstances. *See* Def.'s SOF at ¶ 18; Pl.'s Resp. at ¶ 18 (agreeing that Agreement provides Air Products with some discretion to impose surcharges). Specifically, paragraph 8 of the Agreement's "Additional Terms and Conditions" provides that "[s]urcharges may be assessed in order for [Air Products] to recover increases in its production or delivery costs (e.g., increases in the cost of diesel fuel, natural gas, and/or electric power, or increases arising out of utility deregulation or change in laws)." PSA at ECF p. 3. The Agreement does not create a specific methodology or formula to determine when a surcharge will be assessed or its amount. *See id.*; *see also* Def.'s SOF at ¶ 16; Pl.'s Resp. at ¶ 16. In the following 18 months, Air Products assessed five more surcharges against AST's account,[12] totaling $3.70 per 1,000 SCF

---

[12] Air Products' six surcharges were as follows:

| Effective Date | Surcharge (per 1,000 SCF) | Total Price (per 1,000 SCF) |
|---|---|---|
| May 4, 2018 | $0.10 | $10.55 |
| September 4, 2018 | $1.00 | $11.45 |
| April 1, 2019 | $1.40 | $11.85 |
| July 15, 2019 | $2.50 | $12.95 |
| October 1, 2019 | $3.50 | $13.95 |
| November 12, 2019 | $3.70 | $14.15 |

*See* Def.'s SOF at ¶ 54; Pl.'s Resp. at ¶ 54.

of liquid nitrogen delivered, raising the effective rate AST paid for liquid nitrogen from $10.45 to $14.15 per 1,000 SCF. *See* Def.'s SOF at ¶ 54; Pl.'s Resp. at ¶ 54.

On October 25, 2019, near the end of the Agreement's five-year term, AST asked Air Products to explain the surcharges being assessed to the invoice.[13] *See* Pl.'s SOF at ¶ 79. Air Products did not immediately respond to the request for an explanation. *See id.* at ¶ 80. On December 6, 2019, AST again asked Air Products for a justification of the surcharge. *See id.* Air Products responded on December 11, 2019, conveying that the basis for the surcharge was a national freight-driver shortage causing an increase to delivery costs. *See id.* After investigating the claim and being dissatisfied with this explanation, AST emailed Air Products requesting further explanation of the surcharges. *See id.* AST continued to seek an explanation through January 8, 2020. *See id.* at ¶¶ 81–84.

Meanwhile, on January 6, 2020, an Air Products representative sent an internal email stating:

> [T]his customer is questioning their surcharge increases, but I cannot tell him it's because he constantly shops our price increases with a false offer from a competitor. He feels that we can raise his surcharge as we want with no regulation.
>
> The increases match the driver shortage timing, which was going to be my main explanation for things[.]

*See* Decl. of Mathew P. Jasinski in Supp. of Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts and Statement of Add'l Facts that Preclude Summ. J. ("Jasinski Decl."), Ex. 7, Doc. No. 93.[14]

---

[13] AST claims that it had not noticed that the surcharge had been increased over the course of the Agreement. *See* PL.'s Resp. at ¶ 68. AST noted that the invoices did not show the rate of the surcharge, only the total amount collected from the surcharge. *See id* at ¶ 57. To determine the rate of the surcharge from the invoice, a customer would need to divide the total surcharge cost by the amount of liquid nitrogen delivered during the pay-period. *See id.* AST claims that it had not recognized that the surcharge rate had been increasing until a competitor of Air Products pointed it out. *See id.* at ¶ 68.

[14] This email is under seal and located at Doc. No. 93 at ECF pp. 59–63.

Eventually, Air Products responded to AST's inquiries, stating on February 14, 2020, that the "[s]urcharges account for the fluctuations in diesel, energy and general distribution such as with the national driver shortage or natural disasters." Pl.'s SOF at ¶ 86. Air Products explained that it used a proxy for increases in distribution costs based on Bureau of Labor statistics to determine when to assess surcharges.[15] Pl.'s SOF at ¶¶ 32, 33.

### D.   Amortization of Installation Costs and Removal Costs

On the same date that Air Products was attempting to justify the surcharges, AST contacted Air Products to confirm that the Agreement would terminate on March 10, 2020, and that Air Products would remove its storage tank from AST's premises. *See* Pl.'s SOF at ¶ 87. Air Products confirmed that the Agreement would terminate on that date and quoted AST $11,310 to remove the tank and $5,384 in unamortized costs. *See id.* at ¶ 88.

Regarding equipment Air Products supplied to AST, the Agreement stated as follows:

> Title, possession, and control of Equipment supplied by [Air Products] shall at all times remain in [Air Products] (unless and to the extent otherwise provided in an Addendum to this Agreement), and [Air Products] shall maintain and repair Equipment in accordance with [Air Products'] standard practice at its expense except for damage caused by [AST] or third parties, which shall be paid for by [AST]. . . . Upon any termination or expiration of this Agreement, [AST] shall pay [Air Products'] *costs to remove the Equipment* and shall pay [Air Products'] *unamortized or otherwise unrecovered installation costs and expenses*, if any, and upon [Air Products'] receipt of same, [AST's] applicable Monthly Charge shall cease.

PSA at ECF p. 3 (emphasis added). Although this provision requires AST to pay Air Products' "costs to remove the Equipment" and its "unamortized or otherwise unrecovered installation costs

---

[15] Air Products developed a methodology to act as a proxy for delivery costs based on Bureau of Labor statistics. Def. and Countercl. Pl. Air Prods. and Chemicals Mem. of Law in Supp. of its Mot. for Summ. J. ("Def.'s Mem.") at 6–7, Doc. No. 85-25; Pl.'s SOF at ¶ 32. At oral argument on the motion, Air Products stated that tracking delivery expenses to each individual customer would be more expensive, and that this formula provides a satisfactory proxy. *See* Tr. of Mot. for Summ. J. Hr'g at 30, Doc. No. 100. AST disputes the notion that Air Products used this methodology when applying the surcharges in the instant case but rather, argues Air Products applied surcharges arbitrarily. *See* Pl.'s Resp. at ¶ 31.

9

and expenses, the Agreement does not define "costs to remove" nor are there representations regarding the amortization period of the installation costs. Def.'s SOF at ¶ 73; Pl.'s Resp. at ¶ 73. Air Products had amortized the installation costs—which included the costs of shipping the tank to AST's facility—over 90 months, which is the company standard amortization schedule. Pl.'s SOF at ¶ 96; *see also* Naescher Decl., Ex. C, Doc. No. 87 at ECF p. 230 ("90 months is the corporate standard [amortization schedule]."). Air Products removed the tank from AST's property on March 10, 2020. Def.'s SOF at ¶ 88; Pl.'s Resp. at ¶ 88; Pl.'s SOF at ¶ 89. AST objected to the amortization schedule for the installation costs extending further than the term of the Agreement and that the removal costs included transportation costs shipping the tank from AST's location to a facility.[16] *See* Pl.'s SOF at ¶¶ 88, 93. AST refused to pay these invoices sent by Air Products. *See id.* at ¶ 90.

## III.   DISCUSSION

### A.   <u>Standard of Review – Motions for Summary Judgment</u>

A district court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Additionally, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 105 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

---

[16] Further, AST also objects Air Product's choice of facility. *See* Pl.'s SOF at ¶ 93. AST claims that Air Products transported the tank to a location that was almost double the distance from a closer facility that would have performed the same services. *See id.*

*Lobby, Inc.* 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

The party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the moving party has met this burden, the non-moving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted); *see* Fed. R. Civ. P. 56(c) (stating that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . .; or . . . [by] showing that the materials cited do not establish the absence . . . of a genuine dispute"). The non-movant must show more than the "mere existence of a scintilla of evidence" for elements on which the non-movant bears the burden of production. *Anderson*, 477 U.S. at 252. Bare assertions, conclusory allegations, or suspicions are insufficient to defeat summary judgment. *See Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982) (indicating that party opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions"); *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999) (explaining that "speculation and conclusory allegations" do not satisfy non-moving party's duty to "set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor"). Additionally, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*,

214 F.3d 402, 407 (3d Cir. 2000). Thus, it is not enough to "merely [] restat[e] the allegations" in the complaint; instead, the non-moving party must "point to concrete evidence in the record that supports each and every essential element of his case." *Jones v. Beard*, 145 F. App'x 743, 745–46 (3d Cir. 2005) (per curiam) (citing *Celotex*, 477 U.S. at 322). Moreover, arguments in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted). Further, when one party's claims are "blatantly contradicted by the record, so that no reasonable jury could believe it," the court should not take those claims as true for the "purposes of ruling on a Motion for Summary Judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## B.   Analysis

### 1.   Count I - Breach of Contract Relating to Surcharges

AST's first cause of action is one of breach of contract, arguing that Air Products arbitrarily and discriminatorily assessed surcharges, in violation of the express terms of the Agreement and

the laws of the Commonwealth of Pennsylvania. *See* Am. Compl. at ¶¶ 71–72. Under Pennsylvania law, to prevail on a claim for breach of contract, a plaintiff must establish: "(1) the existence of a contract, including its essential terms[;] (2) a breach of the contract; and, (3) resultant damages." *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016). Here, the only dispute is the second element, i.e., whether Air Products breached the Agreement when it assessed surcharges.

Air Products argues that it did not breach the Agreement because (1) the plain language of the Agreement permitted it to assess surcharges; (2) section 2305 of the Pennsylvania Commercial Code is inapplicable; (3) even if section 2305 applied, then AST cannot show a lack of good faith on the part of Air Products; and (4) the voluntary payment doctrine precludes AST from recovery. *See* Def.'s Mem. at 18–26. As explained below, when viewing the evidence in the light most favorable to the non-moving party, Air Products has not established that there are no disputes as to the material facts such that reasonable jurors could not disagree, and thus, the court must deny the motion for summary judgment on this count.

To interpret the contractual terms of the Agreement, the court first starts with its text. *See Hullett v. Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 111 (3d Cir. 1994) ("We begin our analysis by examining the language of the Agreement."); *Bohler–Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 92–93 (3d Cir. 2001) ("Pennsylvania contract law begins with the firmly settled point that the intent of the parties to a written contract is contained in the writing itself." (citations and quotations omitted)). The relevant portion of the Agreement states:

> **Surcharges may be assessed in order for [Air Products] to recover increases in its production or delivery costs** (e.g. increases in the cost of diesel fuel, natural gas, and/or electric power, or increases arising out of utility deregulation or change in laws).

PSA at ECF p. 3 (emphasis added). The Agreement provides no further guidance on the methodology or mechanism under which Air Products can assess surcharges. *See id.* Air Products contends that the aforementioned provision explicitly permits it to impose surcharges, as it did. *See* Def.'s Mem. at 19. AST argues that because the surcharge can significantly change the final price paid for liquid nitrogen, the surcharge qualifies as an "open-price term" under section 2305 of Pennsylvania's Commercial Code. Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Mem.") at 23–24, Doc. No. 89. Air Products would then have a duty to set the "open-price term" in good faith. *See id.*

a.    <u>Whether the Surcharge is an Open-Price Term</u>

When a contract leaves a price to be set at a future date, either by agreement or unilaterally, the price term is considered open. *See* 13 Pa. C.S. § 2305. Specifically, the Pennsylvania Commercial Code[17] defines an open-price term and the relevant effects this open-price term has on the duties of the parties as follows:

> **(a) General Rule.**--The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if:
>    **(1)** nothing is said as to price;
>    **(2)** the price is left to be agreed by the parties and they fail to agree; or
>    **(3)** the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency that is not so set or recorded.
> **(b) Price to be fixed by party.** A price to be fixed by the seller or by the buyer means a price for him to fix in good faith.

*See id.* at § 2305(a)-(b). In essence, an open-price term is when a contract gives a party the discretion to set a price based on factors indeterminate at the time of entering the contract and the other party has an obligation to pay the future-set price. *See Echols v. Pelullo*, 377 F.3d 272, 278–

---

[17] Article 2 applies to contracts for the present sale of goods and a contract to sell goods at a future time. *See* 13 Pa. C.S. § 2105.  The liquid nitrogen at issue here is a good, as defined under the Pennsylvania Commercial Code. *See id.* This is not contested by the parties.

80 (3d Cir. 2004) (reviewing cases with contracts containing open-price terms). The Pennsylvania Commercial Code creates an implied duty of good faith with respect to contracts with open-price terms so that one party does not abuse the discretion inherent to a binding agreement to set a price in the future. *See* 13 Pa. C.S. § 2305 cmts. 3, 6 (creating rules for open-price terms so that contract cannot be found as unenforceable agreement-to-agree, while still protecting parties from unfair future treatment). The duty of good faith provides the parties with discretion but sets outer bounds for acceptable behavior. *See id.*

Air Products suggests that the Agreement sets the unit price for the liquid nitrogen; therefore, there is no open-price term under the Pennsylvania Commercial Code. *See* Def.'s Mem. at 20. Further, Air Products contends that the surcharge is not an open-price term because it is separate from the unit price and tied to delivery costs. *See id.* In addition, Air Products points out that the Agreement provides it with discretion when to apply surcharges and how much to charge. *See id.* at 5 ("The Agreement thus allows Air Products ***discretion*** to assess product surcharges to recover any increases in Air Products' overall production or delivery costs."). These arguments are unpersuasive.

Here, the unit price, negotiated by the parties and set in the Agreement, created a base price for the liquid nitrogen. *See* Def.'s SOF at ¶ 21; Pl.'s Resp. at ¶ 21. Air Products could unilaterally set the price of the surcharge, which increased the price of the liquid nitrogen. *See* Def.'s SOF at ¶¶ 54, 57, 62–63; Pl.'s Resp. at ¶¶ 54, 57, 62–63. The surcharges—which comprised over 35% of the unit price by the end of the Agreement—gave Air Products the ability to substantially change the price of the liquid nitrogen. *See* Def.'s SOF at ¶ 57; Pl.'s Resp. at ¶ 57.[18] The Agreement does

---

[18] The court recognizes that AST "disputed" paragraph 57 of Air Products' statement of undisputed material facts. *See* Pl.'s Resp. at ¶ 57. Yet, AST does not appear to dispute that the surcharges eventually comprised over 35% of the unit price. *See id.* (citing to paragraph in amended complaint which alleged that surcharges eventually constituted 35% of unit price).

not set a maximum surcharge, nor does Air Products argue there was a maximum.[19] *See* Def.'s Mem. at 20 (arguing that surcharge language gives Air Products discretion to set price and there is no agreed-upon methodology or formula); Pl.'s Mem. at 6 (noting that surcharge increase on November 12, 2019, caused total price of liquid nitrogen to be 35% higher than unit price). The surcharge clause gave Air Products substantial discretion over the final price AST paid for the liquid nitrogen.[20] *See* 13 Pa. C.S. § 2305(b). This discretion leaves the price term open.[21] *See Echols*, 377 F.3d at 277 n.3 (explaining that contract sets open price term when one party is given power to fix price within certain limits set by agreement).

Even though a portion of the price for liquid nitrogen was fixed, there was a substantial portion of the final price set unilaterally by Air Products. *See Truex v. Ocean Dodge, Inc.*, 529 A.2d 1017, 1021 (N.J. Super. App. Div. 1987) (finding an open price term when the parties agreed in principle but failed to set final price at the time of agreement); *see also Wexco Industries v. ADM21 Co., Ltd.*, Civ. A. No. 04-5244 (JLL), 2008 WL 5427867, at *13 (D.N.J. Dec. 30, 2008) (reviewing *Truex*). Similarly, in *Truex*, the court found that the parties' agreement relating to the

---

[19] Being able to apply such a significant increase in the price could be considered the ability to change the price of the good being sold. If the court were to interpret the surcharge provision not to be an open-price term under the Pennsylvania Commercial Code and thus, that no duty of good faith existed, Air Products would have full discretion to raise the price to any level it saw fit. This interpretation would render the shop clause meaningless. *See Cont'l Ins. Co. v. McKain*, 820 F. Supp. 890, 897 (E.D. Pa. 1993) ("When there are alternative readings of a clause in a contract, the rule of construction is that the one that avoids surplusage should be chosen." (citations omitted)), *aff'd*, 19 F.3d 642 (3d Cir. 1994) (Table). The parties agreed to a procedure for when Air Products wanted to raise prices, allowing AST to resist proposed rate hikes under the shop clause.

[20] Air Products argues that because this dispute is over a surcharge rather than a base price, the two cases cited by AST in its brief, *Marcus Dairy, Inc. v. Rollin Dairy Corp.*, Civ. No. 3:05cv589 (PCD), 2008 WL 4425954 (D. Conn. Sept. 24, 2008) and *Neugent v. Beroth Oil Co.*, 560 S.E.2d 829 (N.C. Ct. App. 2002), are distinguishable. *See* Def. and Countercl. Pl. Air Prods. and Chemicals, Inc.'s Reply Br. in Further Supp. of its Mot. for Summ. J. ("Def.'s Reply") at 5 n.7, Doc. No. 96. The court does not find this distinction persuasive. AST is paying money, including the surcharge, in exchange for goods—that is virtually the definition of a "price." *See Price*, Black's Law Dictionary (11th ed. 2010) (defining price as "[t]he amount of money or other consideration asked for or given in exchange for something else; the cost at which something is bought or sold"). Moreover, that price is "open" because the surcharge is a variable cost set after the signing of the Agreement.

[21] Further, the surcharge and the unit price are two components of the final price, rather than independent costs. Both costs were billed at the same unit of measure—per 1,000 SCF of liquid nitrogen. *See* Def.'s SOF at ¶ 54 (measuring surcharge per 1,000 SCF); Pl.'s Resp. at ¶ 54 (same); Pl.'s SOF at ¶ 26 (same).

purchase of a car contained an open price term, even though the parties agreed to a base price, because the parties agreed to change the final price based on the trade-in value for the buyer's used vehicles. *See id.* In this case, the Agreement grants Air Products significant discretion over the final price, and thus creates an open-price term for the liquid nitrogen. *See id.*; *Callahan v. Sunoco, Inc.*, Civ. A. Nos. 03-4461, 04-2915, 04-2916, 04-2918, 04-2919, 04-2920, 04-2921, 04-2922, 04-2923, 2005 WL 994615, at *1–2 (E.D. Pa. Apr. 28, 2005) (concluding that price of gas provided by franchisor to franchisees contained open price term because franchisor would set price at time and place of delivery; as such, franchisor needed to set price of gas in good faith).

Although Air Products acknowledges the Agreement gave it discretion to assess surcharges, it contends that the discretion was not limitless, but rather, it implemented surcharges based on a defined surcharge methodology. *See* Def.'s Mem. at 6–7. Fatal to this argument, Air Products' employees retained discretion to set the final price of the liquid nitrogen. *See* Def.'s SOF at ¶ 18; Pl.'s Resp. at ¶ 18 (agreeing that Agreement provides Air Products with some discretion to impose surcharges); *see also*; *Marcus Dairy, Inc.*, 2008 WL 4425954, at *7 (noting that when a party has discretion to set the final price of a good, the price term is open). For example, in *Callahan*, the court reviewed a contract in which the seller used a mathematical formula to generate a recommended price for the goods sold. 2005 WL 994615, at *1. But, the seller retained discretion to deviate from the formula's suggested price, and thus, the court held that the price term was open and had to be set in good faith. *See id.* at *1–2. Similarly, in *Marcus Dairy*, the court held that the seller's discretion to set the price, rather than being bound by a formula or detailed mechanism, made the price term open. 2008 WL 4425954, at *7. The situation before this court is similar to that of *Callahan* and *Marcus Dairy* because Air Products' employees retained discretion to adjust the rate of the surcharge regardless of index fluctuations. *See id.*; *Callahan*, 2005 WL 994615, at

*2. Therefore, the court finds that the contracted price term for the liquid nitrogen was open, and that Air Products had a requirement to set the surcharge price in good faith.

b.  Good Faith

The Pennsylvania Commercial Code defines "[g]ood faith" as "honesty in fact and the observance of reasonable commercial standards of fair dealing." 13 Pa. C.S. § 1201(b)(20). The statute establishes both a subjective and objective test for good faith.[22] *See In re Jersey Tractor Trailer Training Inc.*, 580 F.3d 147, 156 (3d Cir. 2009) ("This definition has both a subjective prong—"honesty in fact"—and an objective prong—observance of "reasonable commercial standards of fair dealing.") (citation omitted). From the record presented, there are genuine disputes of material fact as to whether Air Products subjectively or objectively violated their duty to assess surcharges in good faith. *See Allapattah Servs., Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1308, 1324 (S.D. Fla. 1999) (explaining that "the parties' intentions in setting an open price term, as well as the reasonableness of an open price term are questions for the trier of fact[]" and "the question of price then—whether it was reasonable as calculated—is a question for the jury to resolve upon the evidence[,]" and concluding that summary judgment was inappropriate because even though defendant had "discretionary authority to set its wholesale price, . . . [a] jury could find that [defendant] breached its duty to act in good faith, thereby breaching its legal obligations under the contract"). The resolution of these disputes is best left to the trier of fact. *Id.*

---

[22] Courts are split as to whether subjective intent on behalf of the price-setting party is necessary for determining whether there was a breach of the duty of good faith under the uniform commercial code. *See Marcus Dairy, Inc.*, 2008 WL 4425954, at *8 (collecting cases). *Compare Allapattah Servs., Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1308, 1322 (S.D. Fla. 1999) (evaluating identical provision of Florida's Commercial Code and noting that "good faith consists of two separate [objective and subjective] components, both of which must be satisfied"), *with Holland Loader Co. v. FLSmidth A/S*, 313 F. Supp. 3d 447, 470 (S.D.N.Y. 2018) (explaining that in New York, standard for evaluating duty of good faith is subjective, not objective). In *Mathis v. Exxon Corp.*, 302 F.3d 448, 454 (5th Cir. 2002), the court stated that a breach of the duty of good faith requires the parties to act both subjectively and objectively reasonable in setting open price terms. Evaluating an identical provision of Texas' Business and Commercial Code, the court stated that "a subjective intent to drive the franchisees out of business would abridge the good faith duty of the open price term." *Id.*

In analyzing the good faith issue, the court first looks to whether Air Products subjectively acted honestly in fact. "[A party] breaches the duty of good faith . . . if that party exercises its discretionary authority arbitrarily, unreasonably, or capriciously, with the objective of preventing the other party from receiving its reasonably expected fruits under the contract." *Callahan*, 2005 WL 994615, at *3 (citation and internal quotation marks omitted); *see also Hartford Accident & Indem. Co. v. First Pa. Bank, N.A.*, 859 F.2d 295, 297 (3d Cir. 1988) (explaining that honesty in fact must be viewed subjectively and "a finding of bad faith must be predicated on showing of dishonesty"). Second, the court looks at whether a reasonable juror could find that Air Products' actions were objectively unreasonable in relation to commercial standards of fair dealing. *See Tom-Lin Enters., Inc. v. Sunoco, Inc. (R&M)*, 349 F.3d 277, 281–82 (6th Cir. 2003) ("[I]t must be shown that the price was not fixed in a commercially reasonable manner and, moreover, that the pricing was commercially unjustifiable."). AST makes a sufficient factual showing such that a reasonable juror could conclude that Air Products breached its duty to set the price in good faith.

First, AST compares the rates of surcharges assessed with the weighted indexes Air Products tracks and Air Products' delivery costs. *See* Pl.'s Mem. at 12. Based on this data, AST argues that the surcharges bore no reasonable relation to the costs Air Products incurred or Air Products' professed rationale for the increases. *See id.* AST contends that the increased surcharges were assessed to increase profitability as constructive rate hikes, rather than serve the proper purpose of recouping increased delivery costs. *Id.* AST asserts that by Air Products using surcharges to avoid the shop clause and institute unit price increases, it deprived AST of the "reasonably expected fruits" of the Agreement. *See id.*; *Callahan*, 2005 WL 994615, at *3 (finding bad faith when party exercises its discretionary authority to deprive other party of "its reasonably expected fruits under the contract").

19

Through this comparison, AST has identified facts which could lead a juror to suspect that Air Products was not actually seeking to only recover delivery costs via surcharges as permitted under the Agreement, but rather, Air Products was using the surcharge to deprive AST of its right to resist price increases via the shop clause—showing improper motive and thus subjective bad faith. *See Callahan*, 2005 WL 994615, at *3 (explaining that plaintiff opposing summary judgment must provide some evidence showing defendant unreasonably set price with intent of depriving plaintiff of their reasonably expected fruits); *see also Nanakuli Paving and Rock Co. v. Shell Oil Co., Inc.*, 664 F.2d 772, 805 (9th Cir. 1981) (explaining that duty of good faith relates to manner in which seller increased price, not necessarily amount of increase).

Second, AST provided an email between two employees of Air Products discussing AST's request for clarity regarding the surcharges. *See* Jasinski Decl., Ex. 7. The author of the email writes, "[T]his customer is questioning their surcharge increases, but I cannot tell him it's because he constantly shops our price increases with a false offer from a competitor." *Id.* The Air Products employees appear to be discussing hiding the true motive of assessing surcharges from AST. *See id.* This evidence could lead a juror to conclude that Air Products acted with both subjective and objective bad faith. A juror could conclude from this email that Air Products had an improper motive to increase the surcharge, rather than simply to recover increases in delivery costs— showing subjective bad faith. *See Marcus Dairy, Inc.*, 2008 WL 4425954, at *7 (noting party alleging breach of covenant of good faith must show some evidence of improper motive). Further, a juror could conclude that Air Products used the surcharges to overcharge AST for liquid nitrogen, outside the accepted commercial standards of fair dealing—showing objective bad faith.[23] *See id.*;

---

[23] Cutting against AST's argument is the notion that it may be commonplace for industrial gas suppliers to use surcharges to routinely raise prices and that savvy buyers resist permitting surcharges in their contracts. *See* Pl.'s Resp. at ¶ 68. Although this evidence relates to objective good faith, AST has provided sufficient evidence creating a genuine dispute that should be properly determined by a jury. *See Ahosting, Inc. v. Logicweb, Inc.*, Civ. A. No. 11-7059, 2013

*Tom-Lin Enters., Inc.*, 349 F.3d at 281 (explaining when prices are set above market rate can show objective bad faith).

Finally, AST identified communications Air Products sent to its employees to encourage sales teams to improve margins and increase profits. *See* Jasinski Decl., Ex. 2, Doc. No. 93.[24] In the communications, Air Products noted that costs have increased, citing driver shortages and other factors. *Id.* But the presentation also reminds the sales team that "[s]enior leadership is expecting us to continue to push price & expand/improve margin[.]" *Id.* at ECF p. 55. The pressure put on Air Products teams to increase profit played a role in determining employee bonuses. *See* Pl.'s SOF at ¶ 70.

The pursuit of profit alone is insufficient for a court to find objective bad faith. *See Tom-Lin Enters., Inc.*, 349 F.3d at 282 (explaining that open price term "need not be the lowest possible price"). But considered with all the other evidence, the pursuit of profit may indicate bad faith. A party can put forth "evidence of improper motive [or] discriminatory pricing" to show a lack of commercial reasonability. *Marcus Dairy, Inc.*, 2008 WL 4425954, at *7; *see also Bayer Cropscience LP v. Albemarle Corp.*, 696 F. App'x 617, 621 (4th Cir. 2017) ("[T]here is no specific test for what constitutes commercially reasonable action under the open price provision of the UCC, and a court must look to the facts of the case to determine whether conduct is commercially reasonable or unreasonable.").

In its attempt to demonstrate that its behavior was objectively reasonable, Air Products points to *Hillmen, Inc. v. Lukoil North America, LLC*, Civ. A. No. 13-4329, 2015 WL 3947960 (E.D. Pa. June 26, 2015). *See* Def.'s Mem. at 22. In *Hillmen*, the court addressed a motion for

---

WL 5635952, at *3 (E.D. Pa. Oct. 11, 2013) (concluding that once sufficient evidence is presented, determination of whether party breached duty of good faith is properly left for jury).
[24] These communications are under seal and located at Doc. No. 93 from ECF pp. 4–58.

summary judgment filed by Lukoil in a dispute between it and a franchisee. 2015 WL 3947960, at
*1. The franchisee alleged that Lukoil, *inter alia*, violated section 2305 of the Pennsylvania
Commercial Code by increasing fuel and rent costs. *Id.* at *11. The court ultimately granted
summary judgment for Lukoil because it determined that the parties' franchise agreement
expressly permitted such increases. *Id.* The court also determined that the franchisee failed to
present evidence of bad faith and rested only on its "bald allegations" in the complaint. *Id.*

Although *Hillman* and the instant case are similar insofar as both cases involve contracts
which permitted the defendant to unilaterally assess additional costs, *Hillman* is distinguishable
because AST has gone beyond its complaint and identified evidence in the record upon which a
jury could find that Air Products assessed surcharges not to recover costs and thus acted in bad
faith. *See id.* AST has pointed to evidence that Air Products was increasing surcharges at the same
time management was allegedly pressuring its employees to increase profitability. In addition,
AST has produced the aforementioned email which could justify an inference that the surcharges
were not imposed in good faith. *See id*. At bottom, there is a genuine issue of material fact as to
whether Air Products acted in bad faith in imposing surcharges, which was an open-price term in
the Agreement, on AST. *See Marcus Dairy, Inc.*, 2008 WL 4425954, at *7 (explaining when sellers
retain discretion to set prices, even based on objective factors, price term is open); *see also
Allapattah Servs., Inc.*, 61 F. Supp. 2d at 1325 (concluding that summary judgment in favor of
defendant was inappropriate because plaintiff presented more than scintilla of evidence that
defendant may not have acted "in a manner consistent with the [Uniform Commercial Code's]
requirement of honesty in fact"); *Bayer Cropscience LP*, 696 F. App'x at 621 (instructing courts
to look at facts of case to determine commercial reasonableness). Therefore, the question of good
faith in setting the open-price term is one for the jury to resolve. *See Ahosting, Inc.*, 2013 WL

5635952, at *3 ("Under Pennsylvania law, whether a party acted in good-faith is a question of fact for the jury."); *Allapattah Servs., Inc.*, 61 F. Supp. 2d at 1324 ("[T]he parties' intentions in setting an open price term, as well as the reasonableness of an open price term are questions for the trier of fact. The question of price then—whether it was reasonable as calculated—is a question for the jury to resolve upon the evidence." (internal citation omitted)).

c. <u>Voluntary Payment Doctrine</u>

Even if a juror could find that it violated its duty of good faith, Air Products argues that there was sufficient evidence to show that AST's voluntary payment of the surcharges precludes recovery on this count. Def.'s Mem. at 25. This argument is not persuasive at this stage of the litigation.

Pennsylvania's voluntary payment doctrine states that:

> one who has voluntarily paid money with full knowledge, or means of knowledge of all the facts, without any fraud having been practiced upon him (and there is here no claim of fraud) cannot recover it back by reason of the payment having been made under a mistake or error as to the applicable rules of law.

*In re Kennedy's Estate*, 183 A. 798, 802 (Pa. 1936) (citations omitted); *see also Abrevaya v. VW Credit Leasing, Ltd.*, Civ. A. No. 09–521, 2009 WL 8466868, at *2 (E.D. Pa. July 22, 2009) (discussing voluntary payment doctrine). However, "if one chose to pay without full knowledge of the facts, or because of the other party's fraud, or under some type of duress, then the voluntary payment doctrine does not apply[.]" *Abrevaya*, 2009 WL 8466868, at *2; *see also Liss & Marion, P.C. v. Recordex Acquisition Corp.*, 983 A.2d 652, 662 (Pa. 2009) (explaining that when party makes payment under mistake of fact, rather than mistake of law, voluntary payment defense does not apply).

Air Products argues that AST paid the invoices despite having all the facts. *See* Def.'s Mem. at 25–26. Air Products contends that at the time of payment, AST was aware that Air

23

Products was assessing surcharges and that AST had the means to determine the reason why the surcharges were imposed. *See id.* Further, they argue that AST could have "research[ed] or investigate[d] the issue" but chose not to do so. *Id.* at 26.

In support of these contentions, Air Products relies on *In re Kent*, 615 B.R. 171 (Bankr. W.D. Pa. 2020). In *In re Kent*, the bankruptcy court explained that the voluntary payment doctrine applies, even if the debtor "did not actually have 'full knowledge' at the time he made the payments, [because] he certainly at least had the means to obtain such knowledge, but he chose not to do so.'" 615 B.R. at 186; *see also Abrevaya*, 2009 WL 8466868, at *2 (holding that voluntary payment doctrine applies when all facts were known and only aspect "misapprehended was the legal consequences of [the] known facts"). Air Products argues that AST paid its invoices in full even after Air Products explained the surcharges. *See* Def.'s Mem. at 26.

In response to Air Products' contentions, AST argues that it tried to investigate the surcharges, but Air Products withheld important facts. *See* Pl.'s SOF at ¶¶ 79–86. This argument is sufficiently supported by the record. Although the invoices included a notice of a surcharge being applied, they did not inform AST of the rate, reason, or calculation methodology. *See id.* at ¶ 57. Once AST was made aware that the surcharges were being increased, it contacted Air Products. *See id.* at ¶ 79. AST emailed Air Products numerous times, requesting that it provide more information to explain the rate of the surcharge being applied to the invoices. *See id.* at ¶¶ 79–80. After multiple requests, AST received a generic rationale for applying a surcharge, but there is no evidence that Air Products provided AST with the weighted formula it used to facilitate the determination of whether to implement or increase surcharges. *See Landay v. Rite Aid*, 40 A.3d 1280, 1289 (Pa. Super. 2012) (concluding that invoices that "merely use[] boilerplate language

and . . . generic terms" are insufficient to provide buyer with enough information to trigger voluntary payment doctrine).

Further, Air Products may not have been fully forthcoming with AST as to the reason behind the surcharges, cutting against its claim that AST had all the information. *See In re Kent*, 615 B.R. at 186. In *In re Kent*, the court emphasized the seller's testimony that if the debtor had asked for the additional information, the seller would have provided it. *See id.* This testimony was supported by an instance where the debtor's attorney asked for information, and the seller promptly turned it over. *See id.* But here, the evidence suggests a different situation. AST asked Air Products multiple times for information on the surcharges and how the rate was determined. *See* Pl.'s SOF at ¶¶ 79–80. Air Products was not forthcoming with the information, responding over a month later, providing excuses for not responding, and providing only partial information to AST. *See* Pl.'s SOF at ¶¶ 80, 81, 85. As Air Products' internal email suggests, AST did not know all the factors Air Products considered in assessing the surcharge. *See* Jasinski Decl., Ex. 7 ("I cannot tell him it's because he constantly shops our price increases with a false offer from a competitor."). If Air Products applied the surcharge, in part, because AST had resisted price increases, then AST did not have the full information and knowledge at the time of payment necessary to apply the voluntary payment doctrine.

At bottom, Air Products had a duty of good faith when setting the surcharges because it is an open-price term under Pennsylvania law. AST provided sufficient evidence such that a reasonable juror could find that Air Products violated that duty. In addition, the court cannot conclude that the voluntary payment doctrine applies as a matter of law. Accordingly, the court will deny Air Products' motion for summary judgment as to AST's breach of contract claim relating to the surcharges.

**2.     Count II – AST's Breach of Contract Claim for Removal Charges and Amortization Costs and Air Products' Counterclaim for Breach of Contract**

Air Products also moves for summary judgment on AST's cause of action for breach of contract with respect to the removal charges and amortization schedule.[25] AST makes two arguments for why this cause of action should survive the motion for summary judgment. First, AST contends that a reasonable juror could find that including shipping costs into the costs of installation and removal was contrary to the express terms of the Agreement. Second, AST argues that reasonable jurors could find that Air Products failed to act in good faith by charging it for installation and removal costs. The court finds neither argument persuasive and thus, will grant the motion for summary judgment with respect to the removal charges and amortization schedule in Count II of the amended complaint. In addition, because the motion for summary judgment is "inextricably linked" to Air Products' counterclaim against AST, the court will grant summary judgment in favor of Air Products on its counterclaim.

a.     <u>Express Terms</u>

The Agreement states that "[u]pon any termination or expiration of this Agreement, Buyer shall pay Seller's costs to remove the Equipment and shall pay Seller's unamortized or otherwise unrecovered installation costs and expenses, if any[.]" PSA at ECF p. 3. The Agreement does not specify the time period of the amortization for the installation costs and expenses or define "costs to remove." *See id.* Undefined contractual terms "are to be given their ordinary meaning." *Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004).

---

[25] Air Products also moves for summary judgment on its counterclaim for breach of contract to recover the balance of the outstanding invoices related to the removal and installation costs. *See* Def.'s Mem. at 35–36. Both parties agree that "AST's Count II and Air Products' counterclaims are inextricably linked." Pl.'s Br. at 36. Therefore, the court will evaluate these claims together.

AST argues that the ordinary meaning of these undefined terms does not permit Air Products to include the costs associated with getting the equipment to AST's facility and shipping the tank to the rehab facility. *See* Pl.'s Br. at 33–34. AST references online dictionaries to prove that the ordinary meaning excludes transportation costs. *See id.* In defining "removal," AST quotes the definitions in Lexico—an online dictionary—and the American Heritage Dictionary to argue that the term "remove" only includes costs Air Products incurred when separating the tank from "the position occupied." *Id.* at 33 ("'[T]o remove' ordinarily means to '[t]ake (something) away or off from the position occupied.' *Remove*, Lexico (Oxford) Online, https://www.lexico.com/en/definition/remove; *accord Remove*, American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=remove ('To move from a place or position occupied: *removed the cups from the table*')"). However, the excerpts taken from the online dictionaries omit important alternative definitions that undercut AST's argument. *See id.*

The American Heritage Dictionary defines the term "remove" to also mean "[t]o transfer or convey from one place **to another**"). *See Remove*, American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=remove (emphasis added). Black's Law Dictionary defines "removal" to also mean "[t]he transfer or moving of a person or thing **from one location, position, or residence to another**." *Removal*, Black's Law Dictionary (11th ed. 2019) (emphasis added). From the sources cited by AST, and other relevant dictionaries, the plain meaning of removal includes the transportation of the tank to another location. *See id.* As such, the court does not find that the Agreement prohibits Air Products from passing these charges onto AST.

Regarding the amortization of installation costs, AST attempts to use the same methodology to show that Air Products' amortization of these costs over 90 months, rather than over the term of the Agreement, conflicts with the plain meaning of the term "amortize." But this

argument is also unpersuasive. AST refers to the American Heritage Dictionary to define "amortize" as "[t]o write off an expenditure . . . by prorating over a certain period, usually the expected duration of the asset's benefit." Pl.'s Br. at 34 (quoting *Amortize*, American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=amortize). AST argues that the expected duration of the benefit was the duration of the Agreement. *See id.* However, when the parties entered into the Agreement, its term was for five years, set to automatically renew every year. *See* PSA at ECF p. 2 ("The initial Term of this Agreement shall be 60 months . . . and the Term shall continue after the initial Term from year to year unless and until terminated[.]"). Thus, the Agreement could extend past the minimum five years, and possibly past the 90-month amortization period. *See id.* Moreover, even if the Agreement was expected to expire after the five-year term, the useful life of the tank does not end, but rather the tank is no longer expected to provide benefits to AST. *See* Pl.'s Br. at 34. Neither party argues that the nitrogen tank could no longer serve its purpose of storing liquid nitrogen upon the termination of the Agreement.

Aside from the online dictionary definitions, AST cites no case law to support its argument that the plain meaning of the undefined terms "removal," "installation," or "amortize" precludes the actions taken here. *See Kripp*, 849 A.2d at 1163; Pl.'s Br. at 31–34. Rather, the plain meaning of these terms permits Air Products' charges. Accordingly, there is no genuine issue of material fact that would prevent the court from concluding, as a matter of law, that Air Products did not breach the express terms of the Agreement by (1) assessing the costs to remove the storage tank from AST's location to the rehabilitation facility or (2) the schedule on which Air Products amortized installation costs.

b.      Good Faith

AST's final argument against the court granting summary judgment on the breach of contract claim in Count II of the amended complaint is that the court should deny the motion because a reasonable juror could find that Air Products breached its duty of good faith in setting the removal costs and by amortizing the installation costs over greater than the base five-year contractual term. *See* Pl.'s Br. at 35. The court disagrees.

At summary judgment in a breach of contract action, the initial burden is on the moving party to show that there is no genuine dispute of any material fact, which essentially means that there is a lack of evidence upon which a jury could return a verdict in favor of the nonmoving party. *See Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288, 289 (3d Cir. 2018) ("To warrant summary judgment, the moving party must establish 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law[.]'" (quoting Fed. R. Civ. P. 56(a))); *Anderson*, 477 U.S. at 248 (explaining that factual dispute is genuine "if the evidence at trial is such that a reasonable jury could return a verdict for the nonmoving party"). Once the moving party satisfies this burden, assuming the nonmoving party bears the burden of proof at trial, it must identify evidence showing that there is a genuine dispute with respect to the material facts, which would require the nonmoving party to demonstrate a prima facie case for breach of contract. *See Santini v. Fuentes,* 795 F.3d 410, 416 (3d Cir. 2015) ("If the moving party meets its burden [to show an absence of a genuine issue of material fact], the burden shifts to the nonmoving party to go beyond the pleadings and 'come forward with "specific facts showing that there is a genuine issue for trial."'" (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 587)); *Sanders v. Kettering Univ.*, 411 F. App'x 771, 777–78 (6th Cir. 2010) (explaining that plaintiff needed to "put forth a prima facie case" of breach of contract to survive motion for summary judgment on that

29

claim). In addition, if the nonmoving party, like AST here, is claiming bad faith on the part of the moving party in setting a commercially unreasonable price, the nonmoving party "must produce some evidence of improper motive, discriminatory pricing, or the pricing practices of other franchisees." *Marcus Dairy*, 2008 WL 4425954, at *7 (citation and quotation marks omitted); *see also Richards v. Direct Energy Servs., LLC* ("*Richards I*"), 246 F. Supp. 3d 538, 558 (D. Conn. 2017) (explaining that there needs to be "more than high prices or profit margins to find a breach [of good faith]," i.e. a showing of bad intent), *aff'd*, 915 F.3d 88 (2d Cir. 2019) ("*Richards II*"). At bottom, AST must show more than the "mere existence of a scintilla of evidence" for elements on which it bears the burden at trial. *See Anderson*, 477 U.S. at 252. Instead, it must lay out a prima facie case of breach-of-contract, making an initial showing that a juror could reasonably find that Air Products breached the implied covenant of good faith under the subjective honest-in-fact or the objective commercial-reasonableness standards. *See id.*; *Allapattah Servs., Inc.*, 61 F. Supp. 2d at 1322. AST failed to put forth such evidence here.

Air Products has satisfied its initial burden of supplying facts regarding the amortization schedule and the removal costs. An Air Products representative stated that "90 months is [Air Products'] corporate standard[.]" Decl. of Heidi Crikelair, Ex. C at ECF p. 230. Further, the representative also explained that the costs are mainly comprised of: "[f]reight to ship the tank from the manufacturer to the customer, engineering time, technician time, any materials needed; piping, special valves, potentially special vaporizers, or other equipment, [and] telemetry unit[s]." *Id.* at ECF pp. 180–81. These cost components are reasonably within the plain meaning of "installation costs and expenses." *See* PSA at ECF pp. 2–3. With respect to the removal costs, Air Products stated that the costs to send the liquid nitrogen tank to the rehab facility totaled $13,625.95, a sum that is undisputed. *See* Pl.'s Resp. at ¶ 90.

Finding that Air Products met its initial burden, the court next analyzes AST's breach-of-contract claim. The court must determine whether: (1) the removal charge was an open price term and, if so, (2) Air Products breached its duty of good faith. *See* 13 Pa. C.S. § 2305; *Richards II* at 99 (evaluating whether company set open price term in good faith in appeal from district court granting summary judgment in favor of company on plaintiff's breach of contract claim).

For many of the same reasons discussed regarding AST's first breach of contract claim, the installation costs and expenses are open-price terms. The Agreement permits one party to set the price for unamortized or otherwise unrecovered installation costs and expenses, as well as costs to remove, in the future. *See* 13 Pa. C.S. § 2305. Thus, Air Products' setting of the price term is subject to the Pennsylvania Commercial Code's covenant of good faith. *See id.*; *see also Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1130 (N.J. 2001) (noting that duty of good faith means seller does not have unbridled discretion but must align with reasonable expectations of parties and be within standards of commercial reasonableness). AST points to three pieces of evidence from which a juror could infer that Air Products violated its duty of good faith. *See* Pl.'s Br. at 35.

First, AST contends that in 2015, an Air Products employee told AST that Air Products would not charge AST for removal costs unless AST exited the Agreement early. *See id.* Second, AST asserts that MSC or the tank rental fee should not continue beyond the term of the lease. *See id.* Third and finally, AST points to Air Products' decision to ship the tank to one rehab facility instead of a geographically closer facility. *See id.* Individually and together, this evidence fails to show that Air Products behaved in bad faith—subjectively or objectively—with respect to the removal costs or amortization schedule. *See Richards I*, 246 F. Supp. 3d at 559 (holding that to find breach of contract under § 2305, "courts require evidence of a party's improper motive . . . or evidence that its price is unreasonable compared to those of competitors").

As for AST's first contention, it points to an alleged comment made by an Air Products representative that there would be no removal charges if AST finished the term of the Agreement. *See* Pl.'s Br. at 35. However, there is no other corroborating evidence that this comment was made, and the plain language of the Agreement, which is fully integrated, conflicts with this comment.[26] *See* PSA at ECF p. 3 ("Upon any termination or expiration of this Agreement, Buyer shall pay Seller's costs to remove the Equipment[.]"). If the parties had come to an understanding and intended for AST to not be responsible for removal costs upon the completion of the five-year term, the Agreement should reflect that understanding. No other testimony or evidence supports that the statement was made or shows that AST relied on it. It is unclear to the court how this evidence can show subjective or objective bad faith. *See Chen v. Chen*, 893 A.2d 87, 93 (Pa. 2006) ("[T]he intent of the parties to a written contract is contained in the writing itself[.]").

As for its second and third contentions, AST contends that a juror could infer bad faith from the fact that Air Products sent the storage tank to a rehab facility in one state rather than a geographically closer state and that "Air Products described the [MSC] as a tank 'rental fee,' which no reasonable person would expect to continue beyond the term of the lease." Pl.'s Br. at 35 (citation omitted). It is unclear whether AST intends for these to show objective or subjective bad faith. *See id.* Nonetheless, AST provides no evidence that any other facility could have or would have accepted the tank, nor is there evidence that sending the tank to the suggested facility would

---

[26] The Agreement contains an integration clause. *See* PSA ("This Agreement, including the additional terms and conditions that follow . . . contains the entire understanding between the parties, superseding any prior agreements[.]"). The plain language of the Agreement may prohibit the court from admitting the representative's comment, as it would violate the parol evidence rule. *See Mellon Bank Corp. v. First Union Real Est. Equity & Mortg. Invs.*, 951 F.2d 1399, 1404 (3d Cir. 1991) (defining parol evidence rule). The Agreement plainly states that upon termination or expiration of the Agreement, AST will pay Air Products' costs to remove the equipment. *See* PSA at ECF p. 3.

have been cheaper.[27] Further, AST failed to identify any evidence in the record supporting the argument that the MSC continued beyond the term of the Agreement. *See generally* Pl.'s SOF.

AST fails to show "more than a scintilla of evidence" that Air Products' behavior violated its duty of good faith. *See Allapattah Servs., Inc.*, 61 F. Supp. 2d at 1325. AST does not put forth evidence that Air Products' removal prices and amortization schedule "violated reasonable commercial standards of fair dealing[.]" *See Tom-Lin Enters.*, 349 F.3d at 282. Additionally, AST does not point to expert testimony, common trade practices, standard amortization tables, or other evidence necessary to show Air Products' actions were objectively unreasonable. *See ConSeal Int'l Inc. v. Neogen Corp.*, 488 F. Supp. 3d 1257, 1277 (S.D. Fla. 2020) ("Departures from customary usages and commercial practice, flushed out through expert testimony, strongly indicate that the merchant's conduct is unreasonable." (citation omitted)). Overall, no reasonable juror could conclude that Air Products subjectively acted in bad faith based on the evidentiary record.

Because the express language of the Agreement permits Air Products' actions, and AST has not made a sufficient showing that Air Products acted in bad faith by amortizing the installation costs or charging removal costs, the court will grant the motion for summary judgment on AST's cause of action for breach of contract with respect to the removal charges and amortization schedule in Count II of the amended complaint. Further, because "AST's Count II and Air Products' counterclaims are inextricably linked" the court will also grant Air Products' motion for summary judgment on Count I of its counterclaim for breach of contract in the amount of the outstanding invoices totaling $13,625.95. *See* Pl.'s Br. at 36, Pl.'s Resp. at ¶ 90.

## IV.   CONCLUSION

---

[27] AST states that another rehab facility was about half as far as the one Air Products chose. *See* Pl.'s Br. at 35. Aside from the milage, AST provides no evidence that sending the tank to a different facility would have saved on costs. *See* Def.'s Reply at 9 n.9.

For the reasons stated above, the court will deny the motion for summary judgment as it relates to AST's claim for breach of contract regarding the surcharges in Count I of the amended complaint. The court will grant the motion for summary judgment with respect to AST's breach of contract claim with respect to the removal charges and amortization schedule in Count II of the amended complaint and Count I of Air Products' counterclaim. The court will dismiss as moot Air Products' unjust enrichment claim in Count II of the counterclaim.

The court will enter a separate order.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.